[No. 5527.]

THE GARNET DITCH AND RESERVOIR COMPANY V. SAMPSON.

1. **Statutes—No Power in the Courts to Imply Exceptions** —The courts have no power to incorporate an exception into an absolute and positive rule, prescribed by statute.—(289)

2. **Statutes—Implied Repeal**—The revision of the entire subject-matter of a statute, evidently intended to prescribe the rule in all cases, is a repeal.—(289)

3. **Statutes Construed**—Sec. 2272, Mills' Stats., is not repealed by the act of April 6, 1899 (Laws 1899, c. 126).—(289-291)

4. **Reservoirs—Liability of Owner**—The owner of a reservoir is liable for injuries occasioned to others by leakage or overflow therefrom, or the breaking of the embankment. No

skill, care, or diligence, in construction or maintenance relieves him.—(289-291)

The natural hillside or mesa, against which the embankment is constructed, and which aids in impounding the water, is part of the reservoir, within the statute. The owner is liable for injuries occasioned by its giving way, though the artificial embankment remain.—(296)

Upon the question whether the fact that the injury occurs by the act of God or the public enemy, no opinion is expressed. —(296)

*Appeal from Delta District Court*—Hon. THERON STEVENS, Judge.

Messrs. KING & STEWART, and Mr. M. FAIRLAMB, for appellant.

Mr. MILTON R. WELCH, for appellee.

CHIEF JUSTICE STEELE delivered the opinion of the court:

The complaint charges that the defendant is a corporation of the state of Colorado, and was, upon the 11th day of April, 1903, and prior thereto, the owner, in the possession of, and operating a certain reservoir called the Bonnie Reservoir, situated on Dry creek, in Montrose county; that water was stored therein by means of a dam across Dry creek; that the embankment or dam burst, and the impounded water escaped with such force as to carry away and destroy a number of cattle that were pastured in the valley below.

The defendant admits that it had impounded a large quantity of water in its reservoir, but denies that the embankment or dam burst, and states that the hillside or mesa against which the dam abutted, broke "by reason of the waters of said reservoir finding an underground passage through some hole burrowed out by some animal." From the second defense, it appears:

That the reservoir was constructed in strict accordance with the plans and specifications of competent and skilled engineers, including the state engineer, and that the plans and specifications of the engineers directed that the dam of the reservoir be abutted at each end of the hillside or mesa. That the defendant had omitted nothing that human skill and foresight suggested in the construction and maintenance of the reservoir to render it absolutely safe.

A general demurrer to the answer was sustained. The first defense having put in issue the amount of the loss sustained by the plaintiff, thereafter the cause was tried by the court, and judgment rendered for the plaintiff in the sum of $495.00. From this judgment the defendant appealed to the court of appeals, assigning as error the sustaining of the demurrer and the rendering of judgment.

We assume that the defendant, its officers and employees, were in no wise culpable and we shall answer the questions propounded by the defendant, "Is the owner of a reservoir an insurer against any loss occurring to persons or property by reason of the escape of water from such reservoir, or can such owner excuse himself by showing the absence of negligence?" as being the only one presented for our consideration.

The statute relied upon as placing an absolute liability upon the owners of a reservoir, has several times been considered by this court and the court of appeals; but the question propounded by defendant has never been answered (by this court).

In *Ditch Co. v. Zimmerman,* 4 Col. App. 78, the court declined to determine whether the owners of reservoirs were or were not insurers against damage, because such issue was not made by the pleadings, but it did hold that the liability was sufficiently abso-

lute to relieve the plaintiff from alleging and proving negligence.

In *Sylvester v. Jerome,* 19 Colo. 128, the court held that the statute (2272 Mills' Ann. Stats., *infra*) was simply an affirmation of a common-law principle.

The common-law principle referred to, as being affirmed by the words of the statute is that declared in the case of *Rylands et al. v. Fletcher,* 3 Law Reports, p. 330 (1868), as follows:

"We think that the true rule of law is, that the person who, for his own purposes, brings on his own land and collects and keeps there anything likely to do mischief if it escapes, must keep it at his own peril; and if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape. He can excuse himself by showing that the escape was owing to the plaintiff's default; or, perhaps, that the escape was the consequence of *vis major,* or the act of God."

But it is said, that the American doctrine is not as announced in the case of *Rylands v. Fletcher, supra,* and is, that one who artificially collects upon his own premises a substance which from its nature is liable to escape and cause mischief to others, must use reasonable care to restrain it, and is answerable for any damage occasioned to others by a want of such care; and Thompson, in his work on Negligence, announces the foregoing as the American doctrine on the subject. We are of opinion that neither the common law nor the so-called American doctrine should control us in the determination of this case, but that the statutes fix the liability of reservoir owners, and we shall base our judgment entirely upon a construction of our own statutes. Sec. 2272, Mills' Ann. Stats., is as follows:

"The owners of the reservoirs shall be liable for all damages arising from leakage or overflow of the

waters therefrom, or by floods caused by breaking of the embankments of such reservoirs." This section is found in the session laws of 1879. The statute places an absolute liability upon the owners of reservoirs for all damages arising from leakage, or. overflow of the water, or by floods caused by the breaking of the embankment. No exception is mentioned, and unless an exception appears in the statute we must presume that none was intended, and it would be a gross abuse of the judicial power to construe away the words of the statute by holding the owners of reservoirs exempt from liability for damage upon their proof of the exercise of reasonable care and caution. In 1899 the legislature enacted An Act in relation to Reservoirs, and it is claimed by counsel that sec. 2272, being the section found in the chapter on Irrigation, was impliedly repealed by the later statute, and the decisions of this court declaring that a subsequent statute revising the whole subject-matter of the former and evidently intended as a substitute for it, although it contains no express words to that effect, must operate as a repeal of the former are cited in support of the contention. This is undoubtedly the rule of construction, and if it were applicable to this case, would control; but the statute of 1899 cannot be said to have been intended by the legislature as a substitute for the law of 1879; by the very terms of the act itself, it only applies to reservoirs having certain capacity or dams having certain dimensions. By the act, dams of the dimensions mentioned are required to be under the supervision of the state engineer, and it becomes his duty to supervise the construction of reservoirs, and exercise a general supervision of them at all times, to the end that they may not overflow and that breakage or seepage may not occur.

(19)

Whenever in his judgment, any of the structures become unsafe, it becomes his duty and the duty of the owners under his direction to draw off sufficient water or to otherwise prevent, if possible, overflow or breakage. Knowing the imminent danger attendant upon the storage of water, and to avoid, as far as it was possible for human agency to avoid, damages to the lower proprietors, the legislature provided the scheme of protection found in the law of 1899, and if the owners of reservoirs are to be absolved from liability for damages upon proof of the exercise of ordinary care in the construction, maintenance and operation of their property, then a compliance with the terms of the statute should, ordinarily, relieve them from all responsibility; but the legislature, with a prophetic vision, saw in the progress of the development of the state, the holding back of the waters of every stream in the mountains for the purpose of storage, to water the lowlands, and to supply the power for manufacturing and other purposes, and that on the elevated portion of the plains there would be constructed reservoirs in great numbers for the storage of water out of season for irrigation purposes, and knowing that unless these reservoirs were constructed and maintained upon scientific principles, they would become a constant menace to the lives and property of citizens, and that each recurring season would witness appalling disasters beyond the possibility of pecuniary compensation, the legislature appears to have been willing to permit the impounding of water, and to provide the means by which structures built for that purpose should be rendered as harmless as skill and science could make them; but it does not show an intention to relieve the owners from liability upon the compliance with the statutory provisions, and to leave the persons and property of our citizens without remedy in the event of injury,

for in the very law which requires supervision by the state engineer, we find the following:

"None of the provisions of this act shall be construed as relieving the owners of any such reservoir from the payment of such damages as may be caused by the breaking of the embankments thereof, but in the event of any such reservoir overflowing, or the embankments, dams or outlets breaking or washing out, the owners thereof shall be liable for all damages occasioned thereby," evincing in positive and direct terms a legislative purpose to hold owners liable for all damages occasioned by the breaking of a reservoir.

Thus, whether the owners of reservoirs have or have not complied with the law of 1899, and whether they were or were not guilty of negligence in the construction or maintenance or operation of their property; and whether the section of the law of 1879 was or was not repealed by the later law of 1899, the liability is the same. It is said that the case of the *Denver City Irrigation & Water Co. v. Middaugh,* 12 Colo. 434, supports the contention of the appellants that they are excused from the payment of damages upon proof of the exercise of ordinary care. A careful reading of Justice Hayt's opinion in that case discloses that the question before the court was not whether the owners of the reservoir were or were not insurers against damages; but whether one whose land had been taken under the Eminent Domain Act for reservoir purposes, and having been awarded a sum of money for damages to the land not taken, can or cannot recover damages upon allegation of negligence or of unskillful construction of the reservoir. The court held that "In assessing damages for the lands taken for the construction of a canal or reservoir thereon, injuries to the residue of such lands arising from seepage and leakage from such canal

and reservoir should be anticipated, and damages for the same should be included in the original assessment; and no subsequent recovery for such injuries will be allowed unless such negligence or unskillfulness be shown."

Our attention is also directed to several decisions of this court holding proprietors to the exercise of ordinary care only, in the construction and operation of ditches, and counsel contends that as the liability of ditch owners and reservoir owners is declared in similar language, although in different sections, no higher degree of care should be required of reservoir owners than is required of ditch owners.

It is true that the ditch owners have been held to the exercise of ordinary care only, for the statute does not hold them to an absolute liability. There is very good reason for the legislative distinction. A ditch carrying water can, by the exercise of ordinary care, be rendered harmless. The carrying of water through ditches is not a dangerous or menacing vocation; the water is not restrained, and the pressure is but slight—while in a reservoir, the water is restrained, and the pressure is very great, so great that the exercise of the greatest amount of care and skill may not prevent the water from effecting its escape.

The statute imposing liability upon railroads, for all damages by fire set out or caused by operating the road, is very similar to the statute we have under consideration, and this court has held that such a law is not in violation of the constitution and that the liability of the railroad company is absolute. The case, *Union Pacific R. R. Co. v. De Busk,* 12 Colo. 294, is a very instructive one and the writer of the opinion reviews many authorities decisive of the question.

As the underlying principle of the decisions upholding the legislative act imposing absolute liability upon railroads for damages by fire apply with equal

force to the statute we have under consideration here, we shall quote at length from some of those decisions. It will be found that it is intimated, at least, that in granting permission to make use of so dangerous an agency as fire, when the utmost care and vigilance cannot prevent injury to innocent persons, if the users of such agency are held to the exercise of ordinary care only, such legislation would not only be unjust, but of doubtful validity.

In the case of *Campbell v. Mo. Pac. Ry. Co.*, 121 Mo. 340, the court, in construing a statute of the state of Missouri, imposing a liability upon railroad companies for damages resulting from fire set out or caused by the operation of its road, had this to say:

"It is unquestioned that the utmost diligence and care cannot prevent the escape of fire from locomotive engines. We have, then, this condition of things. The corporation is given the right, by the statute, to run its engines by steam power, necessitating the use of fire. Fire necessarily escapes, and is scattered along the route. The citizen owns property, on the line of the road, which is exposed to fire from those engines, regardless of the care and vigilance he may exercise. Both parties are faultless, but, nevertheless, the property of the owner is consumed by fire from an engine. The property owner has the right to own the property, and to claim protection under the law, equal at least, to the right of the corporation to use fire on its engines. The loss must necessarily fall upon one or the other of these parties. Which one of them shall suffer the loss, the one through whose agency the damage was caused, though in the lawful use of its own property; or the one equally innocent of wrong, and who had no agency in causing the damage? Tested by the rule of natural right and equity, there could be but one answer to the inquiry. This answer is formulated

into the maxim that 'everyone should so use his own property as not to injure that of his neighbor.' ''

Construing the same statute, the supreme court of Missouri, in the case of *Mathews v. The St. L. & S. P. Ry. Co.*, reported in 121 Mo. 298, said:

''If the state is powerless to protect its citizens from the ravages of fires set out by agencies created by itself, then it fails to meet one of the essentials of a good government. Certainly it fails in the protection of property. The argument of the defendant reduced to its last analysis is this: The state authorized the railroad companies to propel cars by steam. To generate steam, they are compelled to use fire, therefore they can lawfully use fire, and as they are pursuing a lawful business, they are only liable for negligence in its operation; and when in a given case they can demonstrate they are guilty of no negligence, then they cannot be made liable. To this the citizen answers, I also own my land lawfully. I have the right to grow my crops, and erect buildings on it at any place I choose. I did not set in motion any dangerous machinery. You say you are guiltless of negligence. It results then that the state which owes me protection to my property from others, has chartered an agency, which, be it never so careful and cautious and prudent, inevitably destroys my property, and yet denies me all redress. The state has no right to take or damage my property without just compensation. But what the state cannot do directly, it attempts to do indirectly, through the charters granted to railroads, if defendant's contention be true. When it was demonstrated that although the railroads exercised every precaution in the construction of their engines, the choice of their operatives, and clearing their rights of way of all combustibles, still fire was emitted from their engines, and the citizen's property burned, notwithstanding his efforts

to extinguish it, and notwithstanding he had in no way contributed to setting it out, it is perfectly competent for the state to require the company who set out the fire to pay his damages. He is as much entitled to the protection from fire set out by the engines, as he is against the killing of his stock by those engines.''

This latter case was taken by writ of error to the supreme court of the United States (165 U. S. 1), where it was affirmed. Mr. Justice Gray, in delivering the opinion of the court, has this to say:

''The motives which have induced, and the reasons which justify, the legislation now in question, may be summed up thus: Fire, while necessary for many uses of civilized man, is a dangerous, volatile and destructive element, which often escapes in the form of sparks, capable of being wafted afar through the air, and of destroying any combustible property on which they fall; and which, when it has once gained headway, can hardly be arrested or controlled. Railroad corporations, in order the better to carry out the public object of their creation, the sure and prompt transportation of passengers and goods, have been authorized by statute to use locomotive engines propelled by steam generated by fires lighted upon those engines. It is within the authority of the legislature to make adequate provision for protecting the property of others against loss or injury by sparks from such engines. The right of the citizen not to have his property burned without compensation is no less to be regarded than the right of the corporation to set it on fire. To require the utmost care and diligence of the railroad corporations in taking precautions against the escape of fire from their engines might not afford sufficient protection to the owners of property in the neighborhood of the railroads. When both parties are equally faultless, the legisla-

ture may properly consider it to be just that the duty of insuring private property against loss or injury caused by the use of dangerous instruments should rest upon the railroad company, which employs the instruments and creates the peril for its own profit, rather than upon the owner of the property, who has no control over or interest in those instruments.''

Finally it is urged, that the statute imposes no liability except for the breaking of the bank or dam of the reservoir. It is stated in the answer, that neither the bank nor the dam broke, but that the injury was occasioned by the washing out of the mesa or hillside. The contention is that the words ''embankment'' and ''dam'' cannot be construed to cover or include natural barriers. We cannot agree with this contention. In our opinion, whenever the builder of a reservoir uses a natural bank or dam for impounding water, he adopts it as part of his reservoir, and must be held to the same liability as if it were built by him. The legislature did not intend that one who appropriates a natural bank as part of his reservoir should be exempt from liability in the event of its washing out, but did intend the word ''embankment'' should include not only an artificial barrier, but a natural one as well, if used as a part of the reservoir, to prevent the escape of water. This construction is supported by the case of *Barber v. Nottingham Canal Co.*, at p. 747, 15 C. B. N. S.

The storage of water is a source of profitable investment of capital. The owners know, however, that water, from its nature, is pressing outward in all directions and continually striving to break through any artificial barrier by which it may be restrained. They know that the breaking of the barrier may result in great damage to many innocent persons; that death and destruction may follow the escape of the stored water, and the legislature has said to these

owners: "If you collect so dangerous an agency on your own land, you must keep it confined—if it escapes—it is at your peril."

For the reasons given the judgment is affirmed.

Decision *en banc*.                    *Affirmed.*

Mr. JUSTICE CAMPBELL dissents.

Mr. JUSTICE HILL not participating.

Decided February 7, A. D. 1910; rehearing denied July 5, A. D. 1910.

---

Mr. JUSTICE CAMPBELL dissenting:

That it is competent for the general assembly to compel an owner of property, whether or not he is negligent, to respond in damages for all injuries resulting therefrom or caused thereby, in its construction or use, to property of others, in cases like this, there can be no doubt. And I am not prepared to say that the construction which, in the opinion of the chief justice, is put upon the section of the statute under consideration, if the same be wholly removed from other sections of the act of which it is a part, is not reasonable, or not one that the language naturally imports, or that the doctrine promulgated is not wholesome. The briefs of the immediate parties are helpful to us, and additional aid is furnished by an exhaustive brief filed in behalf of the Denver & Rio Grande Railroad Company, as *amicus curiae,* by its attorneys, who have ably argued to uphold the construction which the majority have placed upon this paragraph. It is with some reluctance that I dissent from the conclusion of my associates, for whose judgment I entertain great respect, and were it not for previous decisions of the courts of this jurisdiction upon this, and analogous, statutes, which will presently be mentioned, I might agree with the majority. Counsel for appellant cite a number of au-

thorities under similar statutes which, as they claim, hold that they do not import an absolute liability, or constitute the person or corporation thereby affected an insurer. Among them are *Sutton v. Catawba Powder Co.*, 56 S. E. 966; the text of Black's Pomeroy on Water Rights, §§ 79, 80, 81; § 298, Gould on Waters; and §§ 163, 164 of Wiel on Water Rights in the Western States (2d ed.). As stated in the opinion of the chief justice, the precise question here decided, at least as specifically stated, may be one of first impression in this jurisdiction. Nevertheless, I think that this court and the court of appeals, in decisions involving similar questions, are committed to the holding that the general assembly by this statute did not intend to impose an absolute liability upon owners of reservoirs. Constitutional and statutory provisions quite as sweeping as this paragraph have, by the courts, been given a narrower construction than the literal meaning of the words at first flush indicate, but, in view of the object aimed at, as shown by the context, and the history attending their adoption, it was apparent that a somewhat restricted meaning was intended. A conspicuous example is the repeated announcement by this court that the constitutional mandate that private property shall not be taken or damaged, for public or private use, without just compensation, does not entitle an owner to recover damages for every possible injury to his property. The authorities are collated in *City of Denver v. Bonesteel*, 30 Colo. 107. I cite this, and refer generally to other similar instances, familiar to the profession, as justification for the pronouncements by the appellate courts of this jurisdiction upon this and our various ditch statutes, to which reference is now made. *Sylvester v. Jerome*, 19 Colo. 128, was an action for injunctive relief to prevent the flooding of plaintiff's property by water

from defendant's reservoir. After adverting to the general rule that injunctive relief is not granted to stay a mere private nuisance, the court said that where great and irreparable mischief would result from the wrongs complained of and a suit at law would not afford adequate relief against future acts of a similar character, equity gives relief even against a mere private nuisance. Immediately following such statement, and in response to the argument that this rule as to a private nuisance was changed by the statute which is considered here, the court pertinently said: "The foregoing is simply an affirmation of a common-law principle. It was enacted in this state as part of an act with reference to irrigation. In this act the right is given for the construction of reservoirs for certain purposes, and the context indicates, we think, that the paragraph relied upon was inserted as a precautionary measure, under the apprehension that without it, it would be possible to place such a construction upon the act as would relieve owners of reservoirs from liability for leakage and overflow."

Here then was a distinct announcement by this court that the insertion of this paragraph was not, as claimed by plaintiff here, for the purpose of imposing an absolute liability upon reservoir owners for all damages resulting from the leakage or overflow of the waters thereof, but its object, quite the contrary, was to prevent a possible construction, which, without its presence, might relieve owners of reservoirs of any liability at all because the general assembly had expressly authorized the construction of reservoirs and prescribed safeguards for their maintenance. Neither will it do to say that this announcement was *obiter*, for it was in response to a pertinent argument advanced in the case, and the decision in part was based upon it. Nor can it fairly

be said that the common-law principle referred to is that enunciated in the *Fletcher-Rylands case*. That decision is not generally followed in the United States.—1 Thompson on Negligence, § 706. And it is not enforced in India—though a British possession, where, as in Colorado, reservoirs are a vital part of a system of irrigation.—*Madras Ry. Co. v. Carvetinagarum,* 30 L. T. N. S. (Zemindar) 770; 22 Week Rep. 865; 9 Jacob's Fischer's Digest 13395; 1 Mews English Case Law Digest 175; 14 *id.* 2031. Our court of appeals has repudiated it in *Bishop v. Brown,* 14 Col. App. 535, and this court has not, up to this time, recognized it as applicable to conditions in this state. —*City of Greeley v. Foster,* 32 Colo. 292; *Caughlin v. Campbell-Sell Co.,* 39 Colo. 148. The reference evidently was to the common law, as applicable to conditions in Colorado, which, as applied to liability of reservoir owners, is not the principle declared in the *Rylands case.* If the common law, referred to therein, is the common law which Colorado, by statute, adopted, and which its courts enforce, then there was no necessity for passing this statute, and we are not needlessly to presume that our general assembly is engaged in useless legislation. In *Ditch Co. v. Zimmerman,* 4 Col. App. 78, there was before the court this reservoir statute. It declined to express an opinion as to whether an absolute liability was thereby imposed and it went only to the extent of saying that plaintiff thereunder is not required to allege or prove negligence. *Prima facie* at least a case was made when the damage and cause, by the breaking of the reservoir, are established. The *Middaugh case,* cited in the opinion, as I read it, is clearly against the conclusion of the majority; but I do not pause to analyze it. We have several statutory provisions touching the liability of ditch companies for damages caused by the escape of water.

Sec. 993 of the general incorporation act, Rev. Stats. 1908, reads: "Every ditch company organized under the provisions of this act shall be required to keep their ditch in good condition so that the water shall not be allowed to escape from the same to the injury of any * * * other property." Sec. 3233: "The owner or owners of any ditch for irrigating or other purposes, shall carefully maintain the embankments thereof, so that the waters of such ditch may not flood or damage the premises of others." Sec. 3238: "The owner of any irrigating or mill ditch shall carefully maintain and keep the embankments thereof in good repair." Sec. 3240: "Any person who shall willfully violate * * * the provisions of this act shall, on conviction thereof * * * be fined," etc. While the language of the foregoing statutes concerning ditches is not the same as this sentence in relation to reservoirs, it is submitted with confidence that the liability imposed by the former upon the owner of ditches is just as extensive as the liability which is fastened by the latter upon owners of reservoirs. If, as these ditch statutes say, the owner of a ditch must carefully maintain its embankments so that the waters may not flood or damage the premises of another, and must carefully maintain and keep the embankments thereof in good repair, and is required to keep the ditch in good condition so that the water shall not be allowed to escape from the same to the injury of any other property, or go to waste, and if he fails in these respects, he violates the law and is subject to a fine as for an offense, then, according to the reasoning of the main opinion, if water does escape from the ditch and flood, or damage, or injure the premises of another or go to waste, the ditch owner is liable civilly in damages, irrespective of the question whether or not he has been guilty

of negligence in the construction or maintenance or operation of the ditch; for if he is guilty of a criminal offense if the water goes to waste, or escapes from its artificial channel, notwithstanding his utmost care, it necessarily follows that if thereby injury results to the property of another, he must respond in dam-ages even though he has taken the greatest possible care to prevent it. The mere fact that it escapes, or wastes, is conclusive evidence of his liability. This would be the construction upon the ditch statutes, under the reasoning in the majority opinion upon the language of the reservoir act, for, in legal effect, the liability of a ditch owner under ditch statutes is just as great as that of reservoir owners under the clause before us. And yet, this court and the court of appeals in a number of cases have held, in construing these very sections, that the liability of a ditch owner is not absolute, but is based upon negligence. In *City of Boulder v. Fowler,* 11 Colo. 396, in an opinion by De France, C., approved by this court, it was held that the care required of a ditch owner in this state in the construction and management of his ditch to avoid injuries to others, was ordinary care, such as a man of ordinary prudence and intelligence would employ under like circumstances to protect his prop-erty. In this case specific reference was not made to these statutory provisions; but it is not conceivable that the court was ignorant of their existence or in-tended to state the rule without reference to them. In *Greeley Irrigating Ditch Company v. House,* 14 Colo. 549, these ditch statutes imposing liability on the owner for consequential damages to others was expressly considered by the court, and the opinion, in commenting upon the instructions given by the trial court, clearly shows that the liability of the ditch owner rests upon negligence and that he is not

an insurer. In *Platt and Denver Ditch Co. v. Ander-son,* 8 Colo. 131, in an opinion by Stone, Justice, it was said: "Where a ditch exists by lawful author-ity, its proprietors are not liable for damages result-ing from the existence of the ditch *ipso facto* mere-ly," but the court said that, for the exercise of the lawful powers which the statute conferred upon ditch owners in an improper, careless, or negligent man-ner, there was a remedy. Certainly this observation would not have been made if the liability was an absolute and unconditional one, as, in that case, the liability would attach regardless of negligence. In *Grand Valley Irrigation Company v. Pitzer,* 14 Col. App. 123, the court, by Wilson, Justice, (a case on the liability of a ditch owner for the escape of water from a ditch caused by an unprecedented flood), held that the owner was not liable. In reversing the case and remanding it for a new trial the court observed that at a subsequent trial the evidence might show some negligence on the part of the defendant suffi-cient to impose upon it some legal liability, thereby in legal effect saying, in line with the other decisions already referred to herein, that if the liability exists at all, it is on the ground of negligence. The general assembly has been in session many times since these declarations, but has not seen fit to enact a different rule.

It therefore appearing that our supreme court is committed to the ruling that this section of the stat-ute was not intended to create an absolute liability, in which our court of appeals is disposed to concur, and that both courts have declared, under the ditch statutes, which in terms impose a liability just as broad, that the ditch owners' full duty is discharged if he exercises due care, and that the legislative de-partment, by not effecting a change by statute, has acquiesced therein, we should not, at this late day; in

my judgment, even though we do not entirely agree with the previous announcements, set them aside and adopt a different construction. Most of the existing large reservoirs in this state were built after these decisions were made, their owners doubtless relying on that reasonable safety of their large investments which our courts said their care in construction and operation would tend to insure. I recognize the impropriety of judicial shrinking from giving effect to the mandate of a valid statute merely because the judicial mind fears serious or disastrous results may attend its rigid enforcement. It is not that I anticipate such consequences from the vigorous execution of this section, with the interpretation here put upon it, though that is a circumstance which, in case of doubt, should be considered; but it is because the maxim *stare decisis* is a salutary principle not, to be lightly disregarded, and that decisions which have passed into rules of property ought not to be changed, if at all, except for the most imperative reasons, that I decline to join with my associates, who, I respectfully submit, have given too little attention to these benign principles of the law. I venture the assertion that our profession generally and owners of reservoirs have rightly supposed, from what our courts have hitherto declared, that no such burden rests upon the development of an important industry as the present announcement of my brothers says the general assembly manifestly intended to impose.

---

*On Petition for Rehearing.*

*Per Curiam.*

We have held that the statute imposes an absolute liability, but we have not held that a reservoir owner may, or may not, under the law of the land

and notwithstanding the statute, be excused from liability upon showing that the injury was caused by the act of God or the public enemy.

. Mr. JUSTICE CAMPBELL and Mr. JUSTICE HILL not participating.